**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Jonathan Theodore McCormick

    v.                           Civil No. 16-cv-321-LM
                                       Opinion No. 2017 DNH 208
Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration


# O R D E R


Pursuant to 42 U.S.C. § 405(g), Jonathan McCormick moves to
reverse the Acting Commissioner's decision to deny his
applications for Social Security disability insurance benefits,
or DIB, under Title II of the Social Security Act, 42 U.S.C. §
423, and for supplemental security income, or SSI, under Title
XVI, 42 U.S.C. § 1382.  The Acting Commissioner, in turn, moves
for an order affirming her decision.  For the reasons that
follow, this matter is remanded to the Acting Commissioner for
further proceedings consistent with this order.


## I. Standard of Review

The applicable standard of review in this case provides, in
pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of

the Commissioner of Social Security as to any fact, if
supported by substantial evidence, shall be conclusive
. . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB
decisions); see also 42 U.S.C. § 1383(c)(3) (establishing
§ 405(g) as the standard of review for SSI decisions). However,
the court "must uphold a denial of social security . . .
benefits unless 'the [Acting Commissioner] has committed a legal
or factual error in evaluating a particular claim.'" Manso-
Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per
curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting
Commissioner's findings of fact be supported by substantial
evidence, "[t]he substantial evidence test applies not only to
findings of basic evidentiary facts, but also to inferences and
conclusions drawn from such facts." Alexandrou v. Sullivan, 764
F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,
360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial
evidence is 'more than [a] mere scintilla. It means such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d
594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402
U.S. 389, 401 (1971)). But, "[i]t is the responsibility of the
[Acting Commissioner] to determine issues of credibility and to
draw inferences from the record evidence. Indeed, the

resolution of conflicts in the evidence is for the [Acting Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted).  Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).  Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

The parties have submitted a Joint Statement of Material Facts.  That statement, document no. 11, is part of the court's record and is summarized here, rather than repeated in full.

McCormick worked as a self-employed carpenter until June of 2012.  His medical records include diagnoses of physical conditions affecting his left elbow (bursitis), his left hip (osteoarthritis), his shoulders (high-grade acromioclavicular shoulder separations/instability), his right wrist (joint pain), and his lower back (thoracic or lumbosacral neuritis or

radiculitis, unspecified;[1] spinal stenosis without neurogenic claudication;[2] and lumbosacral spondylosis without myelopathy[3]). He has also been diagnosed with peripheral neuropathy[4] and a mood disorder.

McCormick applied for both DIB and SSI in June of 2013. Because he submitted insufficient evidence, the initial review of his applications included no assessment of either his physical or mental residual functional capacity ("RFC").[5]

---

[1] Neuritis is the "[i]nflammation of a nerve." Stedman's Medical Dictionary 1308 (28th ed. 2006). Radiculitis is a synonym for radiculopathy, which is a "[d]isorder of the spinal nerve roots." Id. at 1622.

[2] Stenosis is "[a] stricture of any canal or orifice." Stedman's, supra note 1, at 1832. Claudication means limping. See id. at 389. Neurogenic means "[o]riginating in, starting from, or caused by, the nervous system or nerve impulses." Id. at 1310.

[3] Spondylosis is "[a]nkylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature." Stedman's, supra note 1, at 1813. Ankylosis is the "[s]tiffening or fixation of a joint as a result of a disease process, with fibrous or bony union across the joint; fusion." Id. at 95. Myelopathy is a "[d]isorder of the spinal cord." Id. at 1270.

[4] Neuropathy is "a disease involving the cranial nerves or the peripheral or autonomic nervous system." Stedman's, supra note 1, at 1313.

[5] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1519 & 416.919.

In January of 2014, McCormick saw Dr. Shawn Harrington for a re-evaluation of his back pain. Several weeks later, Dr. Harrington completed an RFC Questionnaire on McCormick. In it, Dr. Harrington identified diagnoses of lower back pain, spinal stenosis, shoulder pain, and hip osteoarthritis. Dr. Harrington stated that McCormick's impairments resulted in pain, numbness, and back stiffness and that those symptoms were often "severe enough to interfere with the attention [and] concentration required to perform simple work-related tasks." Administrative Transcript (hereinafter "Tr.") 372. Dr. Harrington opined that McCormick: (1) needed to recline or lie down more often than would by permitted by the breaks typically given during a normal workday; (2) could sit and could stand/walk for 30 minutes at a time; (3) could sit and could stand/walk for a total of two hours each in an eight-hour workday; (4) needed a job that permitted shifting positions at will from sitting, standing, or walking; (5) needed to take hourly unscheduled breaks of unknown duration; (6) could frequently lift and carry less than 10 pounds; (7) could never lift and carry any more than that; (8) had unspecified limitations on his capacity for repetitive reaching, handling, or fingering due to wrist arthritis; and (9) was likely to be absent from work more than four times a month due to his impairments or treatment for them.

In March of 2014, McCormick's primary care physician, Dr. Lora McClintock, completed an RFC Questionnaire on McCormick. In it, she identified diagnoses of severe degenerative disc disease of the lumbosacral spine, a condition affecting both shoulders, and a condition affecting McCormick's left hip.[6] She also identified the following symptoms: low back pain, bilateral shoulder pain and limited range of motion, paresthesias,[7] and chronic pain. Dr. McClintock opined that McCormick: (1) needed to recline or lie down more often than would by permitted by the breaks typically given during a normal workday; (2) could walk several city blocks without rest or significant pain; (3) could sit and could stand/walk for 30 minutes at a time; (4) could sit and could stand/walk for a total of four hours each in an eight-hour workday; (5) needed a job that permitted shifting positions at will from sitting, standing, or walking; (6) needed to take unscheduled breaks of unpredictable duration at unpredictable intervals; (7) could occasionally lift and carry up to 10 pounds; (8) could never lift and carry any more than that; (9) could grasp, turn, and twist objects with each hand for 25

---

[6] The entry on the "Diagnosis" line of the questionnaire reads: "severe DDD l-s spine, bl shoulders, L hip." Tr. 394.

[7] Paresthesia is "[a] spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous systems." Stedman's, supra note 1, at 1425.

percent of an eight-hour workday; (10) could perform fine manipulation with the fingers of each hand for 25 percent of an eight-hour workday; (11) could never reach with his arms; and (12) was likely to be absent from work three or four times a month due to his impairments or treatment for them.

The record also includes a Mental Capacity Assessment completed by Jan Manwaring, a licensed clinical social worker. In it, she considered 23 specific abilities and determined that McCormick had: (1) unknown limitations in two abilities; (2) moderate limitations in six abilities; (3) marked limitations in nine abilities; and (4) extreme limitations in six abilities.

After McCormick's applications were denied at the initial level of review, he received a hearing before an Administrative Law Judge ("ALJ"). At the hearing, the ALJ took telephonic testimony from Dr. Arthur Brovender, a board certified orthopedic surgeon who had neither treated nor examined McCormick, but had reviewed McCormick's medical records. After describing the medical records he reviewed, Dr. Brovender stated that McCormick had been diagnosed with degenerative disc disease of the lumbosacral spine, grade one spondylosis, and "osteoarthritis of the set."[8] Tr. 46. He then testified that McCormick did not have a spine disorder that was, under the

---

[8] The court presumes that instead of "set," Dr. Brovender actually said "hip."

relevant regulatory criteria, sufficiently severe to qualify as a _per se_ disabling impairment. Dr. Brovender did not assess the severity of McCormick's osteoarthritis nor did he acknowledge McCormick's diagnosis of peripheral neuropathy.

The ALJ's examination of Dr. Brovender continued in the following manner:

> Q  Based upon your experience, education, and review of this medical record, do you have an opinion as to whether there would be functional limitations that would exist based upon these conditions that you've identified?
>
> A  Yes, he has no limitations for sitting, standing, and walking.  His limitations would be postural; occasional bending, stooping, squatting, and kneeling, stairs and ramps occasional, ropes, ladders, and scaffolds occasional.  I would not have him crawl. Occasional unprotected heights, he could lift 10 pounds continuously, 20 pounds frequently, and 50 pounds occasionally.
>
> Q  Any other limitations?
>
> A  That's all I can think of, your honor.

Tr. 46-47.

When McCormick's attorney asked Dr. Brovender about the discrepancy between the RFC he gave McCormick and the RFCs assessed by Drs. Harrington and McClintock, Dr. Brovender explained that McCormick's "physical examinations show that his motor neurological and sensory examinations were normal, his reflexes were normal, he had no sensory changes, he had no muscle weakness."  Tr. 47.  In response to another question from

McCormick's attorney, Dr. Brovender testified that McCormick's ability to use his upper extremities was unlimited.

After taking testimony from Dr. Brovender, the ALJ took testimony from a vocational expert ("VE"). He began by asking the VE about a hypothetical individual with the following limitations:

> [H]e can lift 50 pounds occasionally, 20 pounds frequently, no limitations with standing, sitting, walking, or manipulation. He should not crawl but all the rest of the posturals are at occasional and he occasionally [can] be exposed to unprotected heights.

Tr. 68-69. According to the VE, a person with the foregoing limitations could do carpentry, as that job is generally performed, i.e., at the medium exertional level. The VE also testified that a person with those limitations could do the job of cleaner, kitchen helper, and packer, all of which are unskilled jobs at the medium exertional level. The applicable regulations provide that "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c) & 416.967(c). In addition, "[a] full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequently lifting or carrying objects weighing up to 20 pounds." Social Security Ruling 83-10, 1983 WL 31251, at *6 (S.S.A. 1983).

In response to a hypothetical question that incorporated Dr. Harrington's limitations, the VE testified there are no jobs that a person with that RFC would be able to perform. In response to a hypothetical question that incorporated Dr. McClintock's limitations, the VE testified that, at most, a person with that RFC could perform the job of surveillance system monitor, but that "if this individual is going to require unscheduled breaks [of] unknown duration or frequency, that could be problematic in terms of performing any work," Tr. 71.

The VE's testimony concluded with a question from McCormick's counsel:

> Q  In your opinion, what are the maximum number of days per month an[] individual can be absent on a continu[ing] basis before it would be problematic?
>
> A  For unskilled work, one day per month, month after month on a continuous basis or more would not be tolerated.

Tr. 72.

After the hearing, the ALJ issued a decision in which he gave little weight to Dr. Harrington's opinion, little weight to Dr. McClintock's opinion, and great weight to Dr. Brovender's opinion. The ALJ's decision also includes the following relevant findings of fact and conclusions of law:

> 3.  The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, right elbow arthritis, alcohol-induced peripheral neuropathy (20 CFR 404.1520(c) and 416.920(c)).

. . . .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . . .

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he has no limitations with sitting, standing, walking, or manipulation. He should never crawl, but could perform the remainder of the postural activities on an occasional basis. He can have occasional exposure to unprotected heights.

. . . .

6. The claimant is capable of performing past relevant work as a carpenter. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

Tr. 15, 17, 18, 25. In addition to determining that McCormick was capable of performing the skilled job of carpenter, as generally performed, the ALJ also determined, in the alternative, that McCormick could perform the jobs of cleaner, kitchen helper, and packer.

### III. Discussion

A. The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached

retirement age; (3) have filed an application; and (4) be under a disability. 42 U.S.C. §§ 423(a)(1)(A)-(D). To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets. 42 U.S.C. § 1382(a). The only question in this case is whether the ALJ correctly determined that McCormick was not under a disability from June 30, 2012, through March 17, 2015.

To decide whether a claimant is disabled for the purpose of determining eligibility for either DIB or SSI benefits, an ALJ is required to employ a five-step process. See 20 C.F.R. §§ 404.1520 (DIB) & 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).

The claimant bears the burden of proving that he is disabled. See Bowen v. Yuckert, 482 U.S. 137, 146 (1987). He

must do so by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) [claimant]'s subjective claims of pain and disability as supported by the testimony of the [claimant] or other witness; and (3) the [claimant]'s educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

### B. McCormick's Claims

McCormick claims that the ALJ: (1) erred in assessing his RFC by giving too little weight to the opinions of Drs. Harrington and McClintock and by giving too much weight to the opinion of Dr. Brovender; and (2) failed to properly consider his mental impairments.  The court agrees that the ALJ did not give good reasons for discounting the opinions of Drs. Harrington and McClintock.

Under the applicable regulations, the opinions of treating sources such as Drs. Harrington and McClintock are entitled to controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [a

claimant's] case record." 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2). Given that the opinions offered by Drs. Harrington and McClintock are not consistent with Dr. Brovender's opinions, there is no good argument to be made that the opinions of McCormick's two treating sources are entitled to controlling weight.

When an ALJ does not give controlling weight to a treating source's opinion, he must still determine how much weight to give that opinion by considering the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the source offering the opinion; and (6) any other relevant factors. See 20 C.F.R. §§ 404.1527(c)(2)-(6) & 416.927(c)(2)-(6). After an ALJ considers the applicable factors, "[i]n many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Hunt v. Colvin, No. 16-cv-159-LM, 2016 WL 7048698, at *7 (D.N.H. Dec. 5, 2016) (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996)).

Finally, an ALJ must give "good reasons in [his] decision for the weight [he] give[s] [a claimant's] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).

> To meet the "good reasons" requirement, the ALJ's reasons must be both specific, see Kenerson v. Astrue, No. 10-cv-161-SM, 2011 WL 1981609, at *4 (D.N.H. May 20, 2011) (citation omitted), and supportable, see Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir. 2010). In sum, the ALJ's reasons must "offer a rationale that could be accepted by a reasonable mind." Widlund v. Astrue, No. 11-cv-371-JL, 2012 WL 1676990, at *9 (D.N.H. Apr. 16, 2012) (citing Lema v. Astrue, C.A. No. 09-11858, 2011 WL 1155195, at *4 (D. Mass. Mar. 21, 2011)), report and recommendation adopted by 2012 WL 1676984 (D.N.H. May 14, 2012).

Jenness v. Colvin, No. 15-cv-005-LM, 2015 WL 9688392, at *6 (D.N.H. Aug. 27, 2015). With regard to the specificity component of the good reasons requirement,

> [a]n AJL must provide specific reasons for assigning weight to a treating source's opinion because "'specific reasons' . . . allow 'subsequent reviewers [to know] . . . the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" Kenerson, 2011 WL 1981609, at *4 (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *5 (1996)). "[W]here no such 'specific reasons' are given, remand is appropriate if the failure renders meaningful review impossible." Id. at *4 (citing Lord v. Apfel, 114 F. Supp. 2d 3, 14 (D.N.H. 2000)).

Jenness, 2015 WL 9688392, at *7.

Having outlined the applicable legal principles, the court turns to the opinions of Drs. Harrington, McClintock, and Brovender.

## 1. Dr. Harrington

In his RFC Questionnaire, Dr. Harrington identified: (1) limitations on sitting, standing, and walking that, according to the VE, would preclude any work; (2) a limitation on lifting and carrying and a limitation on standing and walking that would preclude work at the medium exertional level; and (3) a likelihood of absences from work with a frequency that, according to the VE, would preclude all unskilled work.

After describing the opinions in Dr. Harrington's RFC Questionnaire, the ALJ gave the following evaluation of those opinions:

> This opinion is not well supported by or consistent with the evidence of record. Dr. Harrington identified limitations that are not consistent with the clinical examinations or the claimant's own reports of pain and limitation. For example, [Dr. Harrington] opined that the claimant has wrist arthritis that would limit his ability to engage in certain activities, but in a function report, the claimant did not endorse any difficulty using his hands. Further, the claimant has been able to attend appointments as scheduled without no-shows or arriving late, which shows he is able to maintain a schedule. The claimant's daily activities show that he is able to engage in work-related activities on a regular and consistent basis. Dr. Harrington did not cite to specific clinical examinations or deficits in support of his opinion statement. Overall, I find that his opinion is not well supported by or consistent with the evidence of record, despite his status as a treating provider. For these reasons, I give his opinion little weight.

Tr. 23-24. There are several problems with the ALJ's explanation for the weight he gave Dr. Harrington's opinions.

First of all, while he addressed Dr. Harrington's opinion that McCormick: (1) had limitations on his capacity for repetitive reaching, handling, or fingering; and (2) was likely to be absent from work more than four times a month, he said nothing about Dr. Harrington's opinions on Harrington's capacity for sitting, standing, and walking and his capacity for lifting and carrying. The ALJ was obligated to give good reasons for the weight he gave those opinions, see 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2), and by giving no reasons at all, he necessarily fell short of meeting the "good reasons" requirement.

To be sure, the ALJ stated that Dr. Harrington's opinion, as a whole, was "not well supported by or consistent with the evidence of record," Tr. 23, which echoes two of the factors for evaluating treating source opinions. But without identifying either a particular opinion, such as the limitation on sitting, standing, and waking, and without identifying particular contradictory record evidence, the ALJ's blanket assessment of Dr. Harrington's opinion is insufficiently specific to qualify as a good reason. See Jenness, 2015 WL 9688392, at *7. The ALJ's statement that "[t]he claimant's daily activities also show that he is able to engage in work-related activities on a regular and consistent basis," Tr. 23, suffers from a similar lack of specificity. See Willey v. Colvin, No. 15-cv-368-JL,

2016 WL 1756628, at *5 (D.N.H. Apr. 7, 2016) (rejecting ALJ's
determination that claimant's "reported daily activities
indicate[d] that she would be able to tolerate at least light
lifting and light exertion sitting and standing requirements"
when ALJ "did not point to any specific daily activities that
demonstrate[d] [claimant's] capacity to meet those exertional
requirements").

Not only are the ALJ's explanations thin on specificity,
the specific explanations he did provide are not persuasive.
For example, he discounted Dr. Harrington's opinion on
McCormick's capacity for repetitive reaching, handling, or
fingering because McCormick "did not endorse any difficulty
using his hands," Tr. 23, in a function report he completed
several months before Dr. Harrington gave his opinions.  That
function report asked McCormick to indicate any areas that his
condition affected.  He did not check the box for "Using Hands,"
but he did check the box for "Reaching."  Tr. 250.  His
endorsement of a difficulty with reaching is, in turn,
consistent with Dr. Harrington's opinion that McCormick had
limitations on his capacity for repetitive reaching, handling,
or fingering.  Moreover, in a treatment note that Dr. Harrington
wrote after McCormick filled out his function report, but before
he completed his RFC Questionnaire, McCormick complained of pain
in his right wrist which Dr. Harrington diagnosed as "[c]hronic

[right] wrist pain ? [degenerative joint disease]." Tr. 385. So, the mere fact that McCormick did not check the box for "Using Hands" in his function report is not a good reason for discounting Dr. Harrington's opinion that McCormick had a limited capacity for reaching, handling, or fingering.

The ALJ's reason for discounting Dr. Harrington's opinion that McCormick was likely to be absent from work more than four times a month due to his impairments or treatment for them is even less persuasive. Leaving aside the ALJ's failure to offer any citations to the record to support his observation that McCormick has been able to attend all of his medical appointments, there is a logical problem with the ALJ's explanation. The ALJ does not say how many medical appointments McCormack has attended without mishap.[9] If that number is small, then McCormick's ability to make it on time to a few medical appointments is hardly substantial evidence that he would be able to get to work on a daily basis. But if, on the other hand, the ALJ's observation is based upon a large enough number of medical appointments to make McCormick's attendance at them a reasonable proxy for daily attendance at a job, then that would support Dr. Harrington's opinion that McCormick was likely to have more than four absences from work each month on account of

_____

[9] To her credit, the Acting Commissioner points out that McCormick did actually miss one of his scheduled appointments.

medical treatment.  Either way, the ALJ's explanation is
unpersuasive.

In sum, the ALJ has not given good reasons for giving
little weight to Dr. Harrington's opinions.  His explanation
generally lacks specificity, and when there is a link between a
specific opinion and evidence that purportedly undermines it,
the explanation is either unsupported by the record or logically
flawed.  Given that Dr. Harrington offered several opinions
that, if credited, would preclude McCormick's employment, the
ALJ's failure to give good reasons for discounting those
opinions merits a remand.

### 2. Dr. McClintock

In his RFC Questionnaire, Dr. McClintock identified: (1)
limitations on lifting and carrying and limitations on standing
and walking that would preclude work at the medium exertional
level; (2) a need for unscheduled breaks that would preclude
McCormick from any work; and (3) a likelihood of absences from
work that, according to the VE, would preclude all unskilled
work.

After describing the opinions in Dr. McClintock's RFC
Questionnaire, the ALJ gave the following evaluation of those
opinions:

> Dr. McClintock identified limitations that are not
> well supported by or consistent with the evidence of

20

record.  For example, she also identified
limitation[s] in the claimant's use of his hands, but
this is not something the claimant described in his
function report.  She also stated the claimant could
only stand/walk for 30 minutes at a time, but the
claimant's function report shows that he is able to
spend an hour grocery shopping, which would involve an
hour's worth of standing and walking.  Treatment notes
also show that the claimant did not complain of or
present with side effects from medication.  Overall, I
find that Dr. McClintock's opinion is not well
supported by or consistent with the evidence of record
and entitled to little weight.

Tr. 24.

The ALJ's evaluation of Dr. McClintock's opinions suffers
from the same shortcomings as his evaluation of Dr. Harrington's
opinions.  Again, the ALJ did not address the limitation on
lifting and carrying or the limitation on standing and walking,
either of which would preclude work at the medium exertional
level, nor did he address Dr. McClintock's opinion that
McCormick would require unscheduled breaks that would preclude
any work.  Moreover, apart from the ALJ's discussion of the
limitation related to McCormick's capacity for repetitive
reaching, handling, or fingering, discussed above, the ALJ
provided only two other explanations that are specific enough
for the court to review, see Jenness, 2015 WL 9688392, at *7,
but neither explanation pertains to an opinion of any
significance.

The ALJ challenged Dr. McClintock's opinion that McCormick
can only stand/walk for 30 minutes at a time, but even without

21

that limitation, the remaining limitations in Dr. McClintock's RFC Questionnaire would support a determination that McCormick is disabled. Similarly, the ALJ stated that "[t]reatment notes also show that the claimant did not complain of or present with side effects from medication," Tr. 24, but Dr. McClintock did not assess any limitations based upon side effects of medication. Rather, she simply responded to a question asking her to "[i]dentify the side effects of any medications which may impact [claimant's] capacity for work, i.e., dizziness, drowsiness, stomach upset, etc." Tr. 394. Rather than saying that McCormick was suffering from any specific side effects, Dr. McClintock merely stated that "imbalance [and] uncoordination [were] likely from gabapentin." Id. That was a statement about the nature of gabapentin, not a statement about McCormick's functional capacity. Thus, the statement the ALJ challenges was not even an opinion in the first place. See 20 C.F.R. §§ 404.1527(a)(2) & 416.927(a)(2) ("Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions."). So, while the ALJ did make specific criticisms of two statements in Dr. McClintock's RFC Questionnaire, neither criticism pertained to anything in the questionnaire that, if

disregarded, would undermine the support that Dr. McClintock's opinions provide for an RFC that, if adopted by the ALJ, would result in a determination that McCormick lacks the functional capacity to engage in substantial gainful activity.

To sum up, the ALJ's failure to give good reasons for discounting the opinions in Dr. McClintock's RFC Questionnaire also merits a remand.

### 3. Dr. Brovender

The lack of good reasons for discounting the opinions provided by McCormick's two treating sources is enough to warrant a remand. However, there also appear to be problems with the ALJ's evaluation of Dr. Brovender's opinion.

In two different spots in his decision, the ALJ described his evaluation of Dr. Brovender's opinion and his decision to give that opinion great weight. See Tr. 20, 24. At one point, the ALJ characterized Dr. Brovender as testifying

> that the testing and physical examinations within the
> record showed that the claimant had a normal pelvis,
> normal right elbow, normal gait, no muscle weakness,
> normal motor, sensory and reflex findings, and normal
> neurological findings except for slight weakness of a
> big toe.

Tr. 24. Claimant takes issue with the foregoing statement, and his point is well taken, for two reasons.

First, it is not so clear that Dr. Brovender actually said what the ALJ says he said. With respect to neurological and

sensory findings, Dr. Brovender's testimony consists of the
following:

> In [Exhibit] 12F [Tr. 415-418], he has numbness and
> tingling in his hands and feet with no familiar
> sensory are essentially normal except for a very
> slight decrease of the big toe.  Negative for that.
> [Exhibit] 14F [Tr. 425-449], they talk about sensory
> changes with that.  . . .  He had shoulder pain on the
> right and in [Exhibit] 15F [Tr. 450-467], his
> laboratories, [Exhibit] 16F [Tr. 468-74], his low back
> pain is neurological sensory examination was normal.
> And [Exhibit] 17F, is a form [INAUDIBLE].  The sensory
> is fine, your honor.
>
> . . . .
>
> His physical examinations . . . show that his motor
> neurological and sensory examinations were normal, his
> reflexes were normal, he had no sensory changes, he
> had no muscle weakness.

Tr. 45-46, 47.  That testimony is difficult to follow, and the
court does not understand Dr. Brovender's acknowledgement of a
medical record documenting "talk about sensory changes" in
conjunction with his subsequent statement that "physical
examinations . . . show . . . no sensory changes."  In light of
that apparent contradiction, and the somewhat garbled nature of
Dr. Brovender's testimony as reported in the hearing transcript,
the court simply cannot tell whether Dr. Brovender actually said
that McCormick's sensory and neurological findings were normal.

However, if Dr. Brovender did say that McCormick's sensory
and neurological findings were normal (except for weakness in a
big toe), that appears to be a mischaracterization of the

medical record.  A January 6, 2014, physical examination
resulted in the following finding: "**Neurologic: . . .** Sensation:
**abnormal; toes**."  Tr. 385 (Ex. 7F) (boldface in the original).
That same finding appears in a report on a February 12, 2014,
physical exam.  See Tr. 380 (Ex. 7F).  An April 1, 2014,
physical examination resulted in the following finding:
"**Neurologic: . . .** Sensation: **abnormal, stocking distribution,
glove distribution**."  Tr. 445 (Ex. 14F) (boldface in the
original).[10]  That same finding appears in reports on physical
exams administered on April 30, and June 26, 2014.  See Tr. 425
(Ex. 14F), 429 (Ex. 14F).  The medical records quoted above
appear to document no fewer than five physical examinations that
resulted in sensory and neurological findings that were
something other than normal.

---

[10] "Stocking distribution refers to a sensory neuropathy of
several peripheral nerves in the limbs wherein there is a loss
of pain, touch, temperature, position and vibration sensation,
accompanied by paresthesia, which is an abnormal touch
sensation, such as burning or prickling, often in the absence of
an external stimulus." Potter v. Colvin, No. 14-CV-424-PJC,
2015 WL 5095972, at *5 n.9 (N.D. Okla. Aug. 28, 2015) (citing
Dorland's Illustrated Medical Dictionary, 1287, 1404, 1513, 1718
(31st ed. 2007); see also Cohen v. Astrue, No. 07 Civ.
535(DAB)(HBP), 2011 WL 2565659, at *8 n.43 (S.D.N.Y. May 17,
2011), R. & R. adopted by 2011 WL 2565309 (June 28, 2011) ("The
Commissioner states that 'glove anesthesia is a loss of feeling
in the hands in the area which would be covered by gloves.'")
(quoting the record; citing Attorney's Medical Dictionary G-98,
Vol. 3).

In addition, a report on a battery of tests conducted at the Monadnock Neurology Center includes the following findings:

1. Essentially normal nerve conduction studies in the right upper and lower extremity.

2. Slight chronic changes in the right tibialis anterior - ? Related to old L5 radiculopathy?

3. There were mild active changes noted in the right lower lumbar paraspinal, raising possibility for mild active right lower lumbosacral radiculopathy.

Tr. 443 (Ex. 14F). Without knowing the full ramifications of those findings, the court feels safe in concluding that the "slight chronic changes" and "mild active changes" documented in McCormick's radiology report fall short of being completely normal sensory and neurological findings.

Based upon the foregoing, the court must conclude that to the extent that Dr. Brovender testified that McCormick's sensory and neurological findings were normal, he could only have done so by ignoring evidence from multiple physical examinations that uncovered signs of peripheral neuropathy, an impairment that the ALJ deemed severe but Dr. Brovender did not even mention, much less identify as a medically determinable impairment. In light of the problems with Dr. Brovender's appraisal of the medical record, his opinion does not appear to qualify as substantial evidence in support of the ALJ's RFC assessment.

## IV. Conclusion

For the reasons described above, the Acting Commissioner's motion for an order affirming her decision, document no. 11, is denied, and McCormick's motion to reverse that decision, document no. 9, is granted to the extent that the case is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g). The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 22, 2017

cc:   Janine Gawryl, Esq.
      Robert J. Rabuck, Esq.